1
2
3
4
5
6
7           IN THE UNITED STATES DISTRICT COURT
8       FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   GLENN B. SPILLMAN,                    )    No. C 10-4980 CRB (PR)
                                           )
11              Petitioner,                )    ORDER DENYING
                                           )    PETITION FOR A WRIT OF
12        vs.                              )    HABEAS CORPUS AND
                                           )    DENYING CERTIFICATE OF
13   VINCE CULLEN, Acting Warden,          )    APPEALABILITY
                                           )
14              Respondent.                )
     _____)
15
16          Petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2254.  In an

17   order filed on February 15, 2011, the court found that his petition challenging a

18   conviction and sentence from Monterey County Superior Court, when liberally

19   construed, stated a cognizable claim under section 2254 and ordered respondent

20   to show cause why a writ of habeas corpus should not be granted.  Respondent

21   has filed an answer to the order to show cause.  Petitioner has filed a response to

22   the answer.  Having reviewed the papers and the underlying record, the court

23   concludes that petitioner is not entitled to habeas corpus relief.

24                          **STATEMENT OF THE CASE**

25          A Monterey County Superior Court jury convicted petitioner of second

26   degree murder and found true an enhancement allegation that he fired shots from

27   a motor vehicle.  See Cal. Penal Code §§ 187, 190(d).  The jury did not make

28   findings as to the truth of two personal gun use enhancements.  The court

sentenced Spillman to a state prison term of twenty years to life.  People v. Spillman, No. H030551, 2009 WL 2490132 at *1 (Cal. App. 2009).

Petitioner unsuccessfully appealed his conviction and sentence to the California Court of Appeal, raising the same claims raised here.  The court of appeals affirmed.  People v. Spillman, No. H030551, 2008 WL 1838360 at *1 (Cal. App. 2008).  The California Supreme Court granted a petition for review and deferred action pending a decision on another case with the same issue, People v. Chun, 45 Cal. 4th 1172 (2009).  People v. Spillman, 2009 WL 2490132 at *4 (Cal. App. 2009).  Upon issuance of the opinion in Chun, the supreme court transferred the case back to the court of appeal with instructions to vacate the 2008 opinion and reconsider in light of Chun.  Id.  The court of appeals did so, once again affirming.  Id. at *1.  Petitioner filed another petition for review; it was denied.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

**Evidence at Trial**

In May 2003, Javier Soto was shot and killed as he drove on Highway 101 near White Road in Salinas. Soto was alone in a grey Honda and was headed north when three shots were fired from a pickup truck going in the same direction. Rubi Garcia was driving the pickup truck which belonged to appellant. Appellant was seated next to Rubi and Antonio Garcia was next to appellant.[1] Because appellant had been drinking, he let Rubi drive the truck. Antonio had been drinking beer and had smoked marijuana. He was "kind of buzzed."

Antonio testified at trial that at the time of the shooting he had known Rubi for three or four years and considered Rubi a close friend "like a cousin." Appellant was "just an acquaintance." Antonio testified that the three traveled along Highway 101 and noticed a car in front of them. When Rubi would change lanes to pass it, the car would also change lanes. Antonio said that the other car, "would mess with us." Antonio testified that appellant said something like "look at this guy." He said that appellant got a gun from the glove compartment in front of Antonio. Antonio testified

---

[1]  Because Rubi Garcia and Antonio Garcia have the same last name, we will refer to them by their first names.

that appellant pushed Rubi forward up to the steering wheel and, as Rubi passed the car, appellant fired the gun out of the driver's side window. Before the shooting, the three had been laughing. After the shooting, he and Rubi were quiet and scared. Antonio testified, "I thought he was going to shoot my ass too." When the police pulled them over, appellant told Rubi and Antonio, "Shut up. Don't say [any]thing." Antonio testified that he did not touch the gun that day and that he did not know if Rubi did.

Francis and Shirley Jarschke testified at trial that they had witnessed the shooting. Francis Jarschke said that he was driving on Highway 101 when he saw in his rear view mirror that there was a pickup truck tailgating a Honda. After Mr. Jarschke passed a semi-truck, the Honda and the pickup passed him on the right. When the Honda moved to the left turn lane, the pickup moved to the fast lane and matched speed with it. The pickup "moved over close" to the Honda so that it was within two feet of it. Mr. Jarschke testified that he saw an arm and a pistol extend out of the pickup truck's driver's side window. He said that it would have been "hard for the driver to do it." To Mr. Jarschke, the arm and hand looked like that of a Caucasian male but he could not tell whether it was a left or right arm. The pistol fired three times. The Honda continued a short distance and stopped. Mr. Jarschke told his wife to call 911.

Shirley Jarschke testified that it looked as if the pickup was pursuing the Honda. The driver of the pickup was a female with long dark hair. The driver looked "very excited" like she was "just out joyriding." Mrs. Jarschke saw "the pickup getting beside the Honda and veering over." Mrs. Jarschke saw an arm holding a gun come out of the driver's side of the pickup truck. She acknowledged that she told the 911 dispatcher that the shooter was the driver.

Brent Wooldridge testified that he was northbound on Highway 101 when he saw in his mirrors a car and a pickup that seemed to be chasing one another. Wooldridge moved over to the slow lane to let them pass. Wooldridge testified that the truck moved to the side of the car and appeared to drop back to match speeds. Wooldridge then saw an arm coming out of the driver's side window with a gun in the hand. The arm protruded out the window fully extended for "quite a while" by which Woodridge meant "enough time to where he's either trying to scare the person or trying to take aim." Wooldridge said that the arm was "definitely" that of a male and "it was a Caucasian arm, tanned skin, blond hair." Wooldridge followed the truck as it left the freeway at San Miguel Canyon Road and he called 911. He saw the police remove three people from the truck. When he saw the Caucasian man, he thought, "that was the arm I saw" although he did not mention that to the police officer who spoke to him at the time.[2]

---

[2]  Wooldridge said that the officer did not specifically ask him who the shooter was but that Wooldridge believed that it was "apparent" or "obvious" because the officer said, "Yeah, his name was engraved on the gun."

An off-duty San Jose police officer who was driving on Highway 101 testified that he saw the pickup truck driving recklessly. It was tailgating other vehicles in the fast lane, apparently to get them to changes lanes. Near San Miguel Canyon Road, the officer honked at the pickup. The officer testified that the driver, a female, "turned towards me and she extended her middle finger of her hand, flipping me off. And seemed to kind of laugh.... She then appeared to turn towards the other occupants of the vehicle and appeared to be in discussion ... with them."

California Highway Patrol Officer Drake Wilburn assisted in the stop of the truck. About 10 seconds before the truck stopped, Officer Wilburn saw the middle seat passenger reach down and to his left. Officer Wilburn was wearing sunglasses and looking through the tinted back window of the truck from a distance of about 15 feet. When the truck stopped, the officers found Antonio in the right seat of the front bench seat. Appellant was in the middle and Rubi was in the driver's seat.

After removing the occupants from the truck, another officer found a nine-millimeter Smith and Wesson semi-automatic handgun in a nylon holster under and to the right side of the driver's seat. The holster strap was snapped over the gun and the gun would have been accessible to the middle passenger. A photograph introduced into evidence showed the location of the holster and gun in the truck when the police discovered it.

Appellant was the registered owner of the truck. In the pocket on the lower part of the door on the driver's side, the police found a hunting license with appellant's name on it, a gun magazine loaded with eight bullets and another loaded with 14. Inside the pocket on the passenger's side door was a receipt from Radio Shack with Rubi's name on it. On the passenger's side of the transmission hump was a leather pouch with the name "Garcia" on it containing a box cutter and a pen.

The Honda had bullet strikes in the rear passenger window and front passenger door frame. The front and rear passenger side windows were shattered. Soto had been killed by a shot that entered his body below the top of his right shoulder, passed through his chest and lodged under the back of his left armpit. Three shell casings were found by Highway 101 and two slugs in the Honda doors. Two of the casings were found to have come from the gun that shot Soto. An expert witness who performed a trajectory analysis testified that the sequence of the shots was not certain, but that it was likely to have been that the first shot was from the rear of the Honda, the shot from the side was second, and the shot ahead of the Honda was last. Tests for gunshot residue found none on appellant or Antonio. Some was found on Rubi's left palm, the tops and palms of Soto's hands, and the passenger side of the pickup truck.

A psychologist testified about eyewitness identification. He said that when one is asked a question, one may engage in a "reconstructive process" and that "there may be things that we

didn't really see, but we just sort of add them in because it's plausible." He described studies that found that stress reduced the accuracy of one's memory. He also testified about the "weapon focus effect" in which a witness can describe a gun "pretty well" but cannot describe the person holding it.

Appellant was questioned by the police and a videotape of this was shown at trial. The detective noted that appellant had a strong odor of alcohol about him. Appellant told the detective that he had "no idea" why he was being questioned. He said that he picked Rubi up at her mother's house and then picked up Antonio, who lives across the street from Rubi's mother. Rubi was driving because appellant had been drinking. Appellant told the detective that they had not had any problems with anyone on the road. Appellant said that he had the loaded gun in his car because he "just got back from the Sierras with my boys." Appellant told the detective that there might be gunshot residue in his truck from his hunting trip, but he said that there would not be any gunshot residue on his hands and asked the detective why his hands were "the only ones bagged." When asked why witnesses would have pointed out his truck as the one from which the shots were fired, appellant said, "There's a thousand maroon vehicles goin' down the road." Appellant repeatedly told the detective that no one shot out of his truck and that "I didn't shoot no gun."

<u>Spillman</u>, 2009 WL 2490132 at *1-3 (footnotes in original).

## DISCUSSION

**A.**   **<u>Standard of Review</u>**

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Id.</u> § 2254(d).

When "a federal claim has been presented to a state court and the state

court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 131 S. Ct. 770, 784-85 (2011). And it is not necessary that the state court's rejection of the federal claim be accompanied by reasoning for § 2254(d) to be applied. Id. at 784. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Id.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an

unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts, and only those holdings need be "reasonably" applied.  Id.

## B.    Claims & Analysis

### 1.    Felony Murder Instruction

For his first claim, Petitioner contends that the trial court's felony murder instruction violated his due process rights.

#### a.    Due Process and Jury Instructions

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  "Even if there is some 'ambiguity, inconsistency or deficiency' in [a jury] instruction, such an error does not necessarily constitute a due process violation."  Waddington v. Sarausad, 555 U.S. 179, 190 (2009) (quoting Middleton v. McNeil, 541 U.S. 433, 437 (2004)).  "Rather, the defendant must show both that the instruction was ambiguous and that there was "'a reasonable likelihood'" that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt."  Id. at 190-91 (quoting Estelle, 502 U.S. at 72 [internal quotation marks and citation omitted]).

The court of appeal framed the issue:

> The trial court instructed the jury that it could convict appellant of second degree murder if it found that appellant had killed Soto by committing a felony inherently dangerous to human life. The trial court instructed the jury that a violation of Penal Code section 246, discharging a firearm at an occupied motor vehicle, is a felony inherently dangerous to human life. When appellant's case was first before this court, he contended, "The trial court erred prejudicially in instructing on second-degree felony-murder predicated on violation of section 246." In our first opinion, this court discussed a number of cases on the subject, including People v. Hansen (1994) 9 Cal. 4th 300, People v. Robertson (2004) 34 Cal. 4th 156, and People v. Randle (2005) 35 Cal. 4th 987. We said, "Although appellant makes a well-reasoned, thorough, and thoughtful argument, California Supreme Court precedent compels us to reject it." The Supreme Court granted appellant's petition for

review and deferred action pending disposition of <u>People v. Chun</u> (2009) 45 Cal. 4th 1172. <u>Chun</u> overruled <u>Hansen</u>, <u>Robertson</u> and <u>Randle</u>. On June 12, 2009, the Court transferred this case to us with directions to vacate our decision and to reconsider the cause in light of <u>Chun</u>. We have received supplemental briefs from the parties addressing <u>Chun</u>'s applicability to this case.

In <u>Chun</u>, the California Supreme Court undertook a historical review of the second degree felony murder doctrine and the merger doctrine. The court concluded, "In determining whether a crime merges, the court looks to its elements and not the facts of the case. Accordingly, if the elements of the crime have an assaultive aspect, the crime merges with the underlying homicide even if the elements also include conduct that is not assaultive." (<u>Chun</u>, <u>supra</u>, 45 Cal. 4th 1172, 1200.) The court specifically said, "When the underlying felony is assaultive in nature, such as a violation of section 246 or 246.3, we now conclude that the felony merges with the homicide and cannot be the basis of a felony-murder instruction." (<u>Ibid.</u>) Thus, the trial court erred in instructing on felony murder based on a violation of section 246.

<u>Spillman</u>, 2009 WL 2490132 at *4.

The instruction here opened a way for the jury to find petitioner guilty of second degree murder without the usual requirement that he have acted with malice, the felony-murder rule taking the place of that element. But the felony involved in petitioner's case was section 246 of the penal code, and <u>Chun</u> held that section 246 could not be the basis for application of the felony-murder rule. The instruction thus was the functional equivalent of an instruction that omitted an element, because it permitted the jury to find petitioner guilty of second degree murder on a theory that under California law was invalid. Giving the instruction was a violation of due process. <u>See</u> <u>Evanchyk v. Stewart</u>, 340 F.3d 933, 939 (9th Cir. 2003) (violation of due process for jury instruction to omit element of crime).

### b.   Prejudice

After concluding that a violation of penal code section 246 could not be the basis for felony-murder, the court in <u>Chun</u> concluded that the error there was harmless. <u>People v. Chun</u>, 45 Cal. 4th at 1205. In this case the court of appeal did likewise, applying the "harmless beyond a reasonable doubt" standard for federal constitutional claims established in <u>Chapman v. California</u>, 386 U.S. 18,

24 (1967), and concluding that the error here was harmless.  Spillman, 2009 WL 2490132 at *8.  The standard for harmless error is different for the same claim in a federal habeas case like this one, however.

A conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt, as here, and may have relied on an invalid one – here, the felony murder theory.  See Hedgpeth v. Pulido, 555 U.S. 57, 58 (2008) (per curiam).  Such instructional error is not structural; rather, a reviewing court must apply the harmless-error analysis set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993), and determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." Id. (reversing Ninth Circuit's application of structural error analysis and remanding for application of Brecht).  Use of this standard is appropriate, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the Chapman standard.  Fry v. Pliler, 551 U.S. 112, 121-22 (2007); Bains v. Cambra, 204 F.3d 964, 977 (9th Cir. 2000).  As the Supreme Court stated in Fry, it would make "no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former."  Fry, 551 U.S. at 120 (emphasis in original); see also Merolillo v. Yates, No. 08-56952, slip op. 20935, 20955-56 (9th Cir. 2011) ("In light of Fry and Pliler, we hold that the Brecht 'substantial and injurious effect' standard governs our harmless error review in this case."); Pulido v. Chrones, 629 F.3d 1007, 1012 (9th Cir. 2010) (holding that Fry means that federal habeas court "need not" conduct an AEDPA/Chapman analysis in addition to applying Brecht).

The court of appeal provided an extensive explanation why the error was harmless beyond a reasonable doubt.  Spillman, 2009 WL 2490132 at *4-8.  The court reasoned that (1) because the jury convicted petitioner of second degree murder but was unable to agree on the enhancement allegations that he personally used a firearm, "some jurors believed appellant was the shooter and some were

not convinced that he was;" (2) as to those jurors who believed he was the
shooter, the erroneous felony-murder instruction was harmless beyond a
reasonable doubt; (3) as to those who thought Rubi was the shooter, the evidence
was such that petitioner must have handed her the gun, thereby aiding and
abetting at least the offense of brandishing a gun; (4) "conscious-disregard-for-
life" murder was a natural and probable consequence of brandishing in this
context; so (5) on these facts, any juror, whether the juror thought petitioner was
the shooter or aided and abetted Rubi in the shooting, would have found him
guilty of second degree murder, even if the faulty felony-murder instruction had
not been given.  Id. at *7.

The court of appeal held that the error was harmless beyond a reasonable
doubt based on the above reasoning.  Id. at *8.  And for the same reasons, this
court holds that the erroneous instruction could not have had a substantial and
injurious effect, the more lenient standard for harmless error in federal habeas
cases.  This claim is without merit.

## 2.   **Gang Evidence**

Petitioner contends that his right to present a defense was violated by the
trial court's exclusion of gang evidence that would have supported his theory that
Rubi was the shooter.  The court of appeals explained:

> Before appellant's first trial[3] on these charges, he sought to
> introduce evidence to support a defense theory of third party
> culpability. [Footnote omitted] Appellant's theory was that Soto's
> death was a gang motivated shooting, that Rubi Garcia and Antonio
> Garcia were Norteno gang members, that Rubi perceived Soto to be
> a Sureno gang member because he was wearing blue, and that Rubi
> was the shooter. The theory included the element that Antonio
> Garcia's testimony that appellant was the shooter was false because
> of his bias in favor of Rubi because of their gang ties. Both counsel
> for Rubi and the prosecutor argued against the introduction of any

---

3   "At appellant's first trial, the prosecutor had presented evidence and argument
to support the theory that appellant fired the gun and that Rubi was an aider and abettor.
Although the jury was unable to reach a unanimous verdict as to appellant, Rubi was
convicted."  Id. at *9 (footnote not in original).

gang evidence, including the testimony of a gang expert witness, but their objections were overruled and the evidence was admitted. The trial court based its decision to admit the evidence concerning gang membership on proposed defense evidence that one Michelle Johnson, who had been a fellow inmate with Rubi and had recently been interviewed by an investigator with the District Attorney's Office, would testify that Rubi had admitted to her that she shot Soto because she had thought that he was a Sureno. Appellant's trial counsel had argued that because Michelle Johnson would testify about Rubi's admission, evidence of gang membership of Rubi and Antonio and gang expert testimony was required in order to make the admission understandable to the jury. The trial court agreed.

As it turned out, Michelle Johnson did not testify. Nevertheless, the other gang evidence, including the expert testimony, was admitted at appellant's first trial. After the receipt of this evidence, the trial court reflected on its ruling regarding the admissibility of the gang evidence and stated, "the Court made certain rulings in this case concerning gang evidence. The rulings that the Court made at the time were predicated upon the information the Court had before it at the time, which included a belief of the attorneys, that a statement by Michelle Johnson that had been ruled admissible by the Court would in fact be utilized in this case. [¶] And the Court, based a number of its rulings as to admissibility of gang evidence on the statements that were attributed to Rubi Garcia in that particular statement.... Had the Court known at that time that the Michelle Johnson statement or testimony would not be offered, the Court's review of that particular gang evidence and its admissibility may very well have been different and even somewhat more limited or excluded in its entirety. [¶] And the Court felt compelled to put that on the record should a reviewing court at some point in time need to review the admissibility of that evidence and the court's rationale or thought process as to why that evidence was admitted." (People v. Garcia, H028474, p. 14.)

The first trial ended with a mistrial being declared as to appellant and a first degree murder conviction as to Rubi. Following the first trial, Rubi Garcia appealed her conviction to this court, arguing that the trial court had erred by admitting the gang membership evidence and by permitting appellant's gang expert to testify. This court reviewed the strength of the gang evidence and concluded, "Given the exceedingly low probative value of this evidence, and its powerful prejudicial impact, and with due consideration of the deferential standard of review, we find that its admission was an abuse of discretion." (People v. Garcia, H028474, p. 19.) This court reversed Rubi Garcia's conviction.

Before appellant's second trial, in which he was the sole defendant, appellant once again sought admission of the gang evidence. He brought a motion "to present evidence of third party culpability, gang evidence, and gang expert testimony." The motion repeatedly referred to, and attached as an exhibit, the interview with Michelle Johnson conducted by the investigator in August 2004. Defense counsel argued that evidence of gang membership of Rubi and Antonio was relevant to show bias and relevant on the issue of

11

"motive, identity, or intent." Defense counsel said that the gang evidence was "highly probative of what Rubi Garcia's intent and motive would have been to go from what is road rage, at least as the thing that might have drawn their attention to this person to rise to the next level of actually going so far as to shoot and kill." Neither Rubi Garcia nor Michelle Johnson testified.

The trial court denied the defense motion. The trial court said that "absent the statement of Michelle Johnson, there really just is a category of evidence in which it could be said, could be interpreted that they are gang members. The driving down the road, next thing that happens is Mr. Soto gets shot. There isn't anything in the two of those, absent her statement, that creates what the Court calls a nexus." The court also said that it was excluding the evidence under Evidence Code section 352 because the probative value of the proposed evidence was outweighed by the "undue consumption of time" and "substantial danger [of] confusing [the] issues or misleading the jury."

Spillman, 2009 WL 2490132 at *11-12 (footnote renumbered).

The court of appeal considered whether the evidence should have been admitted to show a motive for Rubi to have committed the crime (third party culpability evidence) or to show a motive to fabricate on Antonio's part. The court concluded that without the Michelle Johnson testimony, the theory that Rubi was the shooter and motivated by gang rivalry "had no support." Id. at *13. Even without the gang evidence counsel was able to argue that Rubi was the shooter and present evidence to support that proposition, so the third-party culpability defense was not completely stymied. Id. That is, the exclusion of the gang evidence barred the defense from arguing that as a motive, but petitioner was still able to argue that Rubi was the shooter and that road rage was the motive. The court also noted that in fact the only evidence that the victim was a Sureno was that he was wearing blue work clothes. Id.

As to the argument that the gang evidence would have shown a motive to fabricate on Antonio's part, a motive to shift the blame from his fellow Norteno to Spillman, the court concluded that the "evidence of Rubi's Norteno gang affiliation was weak," and the excluded evidence would have taken "a fair amount of time to present and presented a danger of confusing the jury. More

importantly, it did not have any significant probative value." Id.  And petitioner was able to present evidence that Antonio and Rubi were close, so he was not completely prevented from pursuing the "motive to fabricate" argument.  See id.

The court therefore concluded that excluding the evidence under section 352 of the California Evidence Code was not error.  Id.  It did not discuss the federal aspects of the claim.

Exclusion of defense evidence, even when proper under state law, can violate due process or a defendant's rights under the Confrontation Clause.  See Holmes v. South Carolina, 547 U.S. 319, 1731 (2006) (although state lawmakers have "broad latitude" to establish rules excluding evidence in criminal trials, that latitude has constitutional limits).  Regardless of the amendment in which the right to a defense is grounded, the analysis is the same.  Id. (whether right is rooted in the Due Process Clause of the Fourteenth Amendment or Compulsory Process Clause or Confrontation Clause, Constitution guarantees meaningful opportunity to present defense, which is abridged by state evidence rules that infringe on weighty interest of accused and are arbitrary or disproportionate to their purposes); Crane v. Kentucky, 476 U.S. 683, 690-91 (1986) (right to present a defense may be rooted in the Fourteenth Amendment's Due Process Clause or in the Sixth Amendment's confrontation or compulsory process clauses); see also Rock v. Arkansas, 483 U.S. 44, 56-62 (1987) (right to testify arising from the Fourteenth Amendment's due process clause, Sixth Amendment's Compulsory Process Clause, and Fifth Amendment's right not to be compelled to testify).  The Ninth Circuit has summarized the rule as "states may not impede a defendant's right to put on a defense by imposing mechanistic (Chambers) or arbitrary (Washington and Rock) rules of evidence." LaGrand v. Stewart, 133 F.3d 1253, 1266 (9th Cir. 1998) (referring to  Chambers v. Mississippi, 410 U.S. 284 (1973) (due process case); Washington v. Texas, 388 U.S. 14 (1967) (due process case); and Rock v. Arkansas, 483 U.S. 44 (1987) (due process. compulsory process,

Fifth Amendment's right not to testify).

The question then is whether the California evidentiary rule as applied here unreasonable, arbitrary or disproportionate to the purpose it is intended to serve. The purpose of the rule is to allow the trial courts to exclude evidence which has minimal probative value compared with the cost of admitting it – costs in the potential for unfair prejudice, the amount of time that would be consumed, or the confusion it would cause the jury. The rule is flexible by its terms, allowing the trial court to balance the value of the evidence against the disadvantages of admitting it, and for the reasons set out by the court of appeal, the rule as applied in this case did not prevent petitioner from presenting his third-party culpability defense or arguing that Antonio's testimony was suspect because of his friendship with Rubi. The rule as applied here was not unreasonable, arbitrary or disproportionate to the purpose it is intended to serve.

Because there was no constitutional violation, the rejections of these claims by the state appellate courts were not contrary to, or unreasonable applications of, clearly-established United States Supreme Court authority.

## CONCLUSION

The petition for a writ of habeas corpus is DENIED. A certificate of appealability under 28 U.S.C. § 2253(c) is DENIED because petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED:   March15, 2012

CHARLES R. BREYER
United States District Judge